UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-24282-CIV-HOEVELER

JAMES JONES,

      Plaintiff,

v.

BERT BELL/PETE ROZELLE NFL
PLAYER RETIREMENT PLAN,

      Defendant.

_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court on the parties' motions for summary judgment. The Court has reviewed the motions and all pertinent portions of the Administrative Record, including the two video discs submitted pursuant to the parties' agreement; based on that review, the Court finds that Defendant is entitled to judgment in its favor, for the reasons stated below.

## BACKGROUND

This lawsuit was filed pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq., on December 1, 2010, seeking to recover benefits pursuant to the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Plan"). Plaintiff Jones is a retired professional football player whom has been receiving retirement benefits; this action challenges the Plan's denial of Jones's application for additional benefits based on his claimed "total and permanent" disability due to football-related

injuries.

The Plan[1] provides retirement, disability, and related benefits to eligible former professional football players and their beneficiaries, and is an employee benefit plan subject to ERISA.   The Plan is administered by a Retirement Board ("Board"), comprised of three members appointed by the National Football League Players Association ("PA") and three members appointed by the National Football League Management Council ("MC"). The Plan grants the Board "full and absolute discretion" to interpret the Plan and make decisions as to claims for benefits.  Plan (ECF. No. 37-2), § 8.2.


## STANDARD OF REVIEW

The Court reviews the denial of ERISA benefits *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1354-55 (11th Cir.), *cert. denied*, 132 S. Ct. 849 (2011).  As noted above, the Plan at issue here grants "full and absolute discretion" to its administrator, the Board, to interpret the Plan and make decisions as to claims for benefits.   Plan, § 8.2.  In light of that discretion, the Court must uphold the Plan's determination unless it is found to be

---

[1]The Plan submitted for the Court's review includes revisions as of April 1, 2009, unless otherwise indicated.  The parties have not argued that any revisions to the Plan made prior to that date, i.e., the merger in 1994 or the revisions in 1996, 1998, 2002, 2006 or later, are material to the issues before the Court, and therefore the Court refers solely to the version of the Plan submitted.

"arbitrary and capricious." Ward v. Ret. Bd. of Bert Bell/Pete Rozelle NFL Player Ret. Plan, 643 F. 3d 1331 (11th Cir. 2011). The Court is limited to the evidence in the administrative record,[2] and will uphold the Plan's decision if there is a reasonable basis for the Plan's denial of benefits, even if there is evidence supporting a contrary result. In other words, I must determine whether the Board had "reasonable grounds" to support its decision. Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1354-55 (11th Cir.), cert. denied, 132 S. Ct. 849 (2011).

If I find that the Board had a reasonable basis for its decision, and that the Board is not operating under a conflict of interest, then I must affirm the Board's decision. Other courts have held that this Plan's structure does not create a conflict of interest for the Board, as the NFL clubs fund the Plan and the Board determines eligibility (i.e., the Plan's administrator, the Board, does not pay claims out of its own assets). Morris v. National Football League Retirement Board, 833 F. Supp. 2d 1374, 1386 (S.D. Fla. 2011), aff'd 2012 U.S. App. LEXIS 14361 (July 13, 2012); Boyd v. Bert Bell/Pete Rozelle NFL Player Retirement Plan, 796 F. Supp. 2d 682, 690-91 (D. Md. 2011), citing Sagapolutele v. Bell, 2008 U.S. Dist. LEXIS 121061 (D. Md. Oct. 22, 2008). I agree with those decisions finding that the Plan Administrator, the Board, does not suffer from a conflict of interest, or that if any such conflict does exist, it is so minimized by the Plan's structure, e.g., the equal representation of both Players and Management on the Board, the requirement of a majority decision, and the reliance on an independent physician for a binding decision in the event of a deadlock among the Board, so as not to be

---

[2] Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1140 (11th Cir. 1989).

significant.  Thus, if the record reveals that the Board had substantial evidence to support its decision, i.e., there was a reasonable basis for the Board's decision, then I will affirm.  Even if I find that the decision was wrong, it will be upheld unless it was the result of an abuse of discretion, i.e., it was arbitrary and capricious.

The parties' motions for summary judgment address the essential question before the Court: was the Defendant's denial of Plaintiff's application for benefits wrong and, if the decision was wrong, was that decision the result of the Board's abuse of the discretion with which it is vested in reviewing benefits claims?  If the decision was not wrong, or - even if wrong - the decision was not made in an arbitrary and capricious manner, then I must affirm the decision.


## FACTS

The parties agree as to the following facts.[3]


### Jones's eligibility for, and receipt of, early retirement benefits

Jones was a fullback in the National Football League ("League"), playing with the Detroit Lions from 1983 until 1990, and with the Seattle Seahawks from 1990 - 1993.  He accrued eleven Credited Seasons (from 1983-1993), as defined in the Plan, §1.10, and was, therefore, a "Vested Inactive Player" ("Player") eligible to apply for certain benefits pursuant to the Plan, see Plan, §§ 1.1, 1.36, 1.37.

The Plan provides that a Player's "Normal Retirement Date" occurs when that

---

[3]See ECF Nos. 39, 47.  The Court has referenced the specific page of the Administrative Record occasionally, for clarity.

Player reaches fifty-five years of age, Plan, § 1.25; Jones was born on March 22, 1961, and will reach his Normal Retirement Date on March 22, 2016. For those Players who do not wish to wait until age 55 to begin receiving retirement benefits, the Plan provides for an "Early Payment Benefit" ("EPB"), pursuant to § 4.5 of the Plan, which represents "the Actuarial Equivalent of 25% of the sum of a Player's Benefit Credits." Plan, § 4.5. This EPB is available for Vested Players who wish to receive a lump sum and are willing to accept that their monthly pension, or any future disability benefits under the Plan, will be reduced by 25% (or will be based on 75% of the sum of the Player's Benefit Credits at the time of the EPB distribution). Id.[4]

In 1996, Jones applied for and received a one-time payment of $24,138.03, which was the estimated present value of 25% of his benefit credits. The receipt of this payment triggered a reduction in any subsequently received monthly retirement or disability or death benefits.

The Plan also provides for an early retirement option.[5]  In June 2007, Jones applied for retirement benefits commencing on an early retirement date of July 1, 2007, and elected to receive his benefits in the form of a "Life and Contingent Annuitant

---

[4]A Player's regular monthly pension is calculated as the sum of his Benefit Credits for each of his Credited Seasons. Plan, § 4.1. The Plan provided that the Benefit Credit was $210 per season for the first ten seasons during which Jones played in the League and $220 for the eleventh season, JRJ 000009, so Jones was eligible for $2320 as a regular monthly pension if he had retired at his Normal Retirement Date, id.

[5]A player may elect to begin to receive benefits as of the first day of any month coincident with or next following his forty-fifth birthday and before his normal retirement date. Plan, § 4.3.

Pension."[6]   Pursuant to this election, Jones began receiving a monthly retirement benefit of $983.06 as of July 1, 2007.[7]   By electing to receive EPB Jones already had reduced the amount of, but not his eligibility for, the Plan's disability benefits, see Plan, §§ 4.5, 5.1.   His decision to accept the early retirement option, however, did limit his option to seek disability benefits, subject to an exception which was created during a "Window Period" - discussed below.[8]   Indeed, Jones signed a Retirement Benefit Election Form in which he confirmed his understanding that upon receiving retirement benefits he would forfeit eligibility for disability benefits.   JRJ 000036.

<u>Jones's application to receive benefits due to "total and permanent" disability</u>

According to the Plan, a Player is eligible for benefits if he is "determined by the Retirement Board or the Disability Initial Claims Committee to be totally and

---

[6]Such election resulted in his receipt of a reduced monthly pension during his lifetime, and 100% of the benefit continuing to be paid to his spouse if he pre-deceased her.

[7]"The monthly pension of a Vested Player who begins to receive benefits before his Normal Retirement Date will be decreased so as to be the Actuarial Equivalent of the monthly pension he could have elected to receive at his Normal Retirement Date.   Further adjustments to a Vested Player's monthly pension may also be made as described in Sections 4.4 and 4.5 below depending on the form or manner in which benefits are paid."   Plan, § 4.3. Because Jones had taken an EPB, his early retirement monthly benefit was $1,110.80, which was reduced to $983.06 in order to provide for the contingent annuity (for his spouse, upon Jones's death). JRJ 000034.

[8]The Plan generally precludes payment of "total and permanent" disability benefits to a Player who is already receiving retirement benefits.   Plan, § 5.1. However, for those Players, like Jones, who already had elected early retirement, a "Window Period" was created.   Thus, Jones's decision in 1996 and in 2007 to accept EPB and early retirement, respectively, did not completely eliminate his right to apply for disability benefits in 2008, subject to the provisions of the Window Period.

permanently disabled." Plan, § 5.1.  The Plan defines that level of disability:

> An eligible Player will be deemed to be totally and permanently disabled if the Retirement Board or the Disability Initial Claims Committee finds that he has become <u>totally disabled</u> to the extent that he is <u>substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit</u> ....  A Player will not be considered to be able to engage in any occupation or employment for remuneration or profit within the meaning of [this Section] merely because such person is employed by the League or an Employer, manages personal or family investments, is employed by or associated with a charitable organization, or is employed out of benevolence.

Plan, § 5.2(a) (emphasis added).

Although the Plan generally precludes payment of "total and permanent" disability benefits to a Player who is already receiving retirement benefits, Plan, § 5.1, the Plan created a brief Window Period for those Players, like Jones, who already had elected to receive early retirement benefits; during that Window Period, Players could apply for an increase to their pension if they were totally and permanently disabled.[9] (After that Window Period, the provisions of § 5.1 applied and a Player electing to receive retirement benefits forfeited his ability to seek disability benefits.)

According to the Plan,

> (a) [a Player] who began to receive retirement benefits under Article 4 prior to his Normal Retirement Date, and who satisfies the other requirements of this Article 5 will receive an increased pension if he is deemed to be totally and permanently disabled under subsection (b)(1) or (2) below pursuant to an application or similar letter that (1) begins the administrative process that results in the award of the benefit and (2) is received by the Plan during the 2008 Window Period.  The 2008 Window Period began on April 1, 2008 and ended on July 31, 2008.

> (b) Window Period Standards:

_____

[9] Any payment of disability benefits to such a Player would be reduced by the value of retirement benefits the Player already had received for the same period. Plan, § 5.8(f).

(1)     A Player described in subsection (a) above will be deemed totally and permanently disabled for all months in which he receives disability benefits from either the Social Security disability insurance program or Supplemental Security Income program, but only if he demonstrates that he is receiving such Social Security disability benefits at the time his application under the 2008 Window Period is received, and only if he was awarded such Social Security disability benefits as of a date that precedes his Normal Retirement Date.

(2)     A Player described in subsection (a) above, whose Normal Retirement Date is after April 1, 2008, and who does not meet the standard in subsection (b)(1) immediately above, will be deemed totally and permanently disabled for those months in which he satisfies Section 5.2(a).

Plan, § 5.8.  Thus, a Player who submitted an application in the Window Period but who was not receiving Social Security benefits at the time could receive disability benefits but only if he met the Plan's disability definition contained in § 5.2(a).

On July 30, 2008, i.e., within the 2008 Window Period, Plaintiff submitted a timely application for benefits pursuant to the Plan's "total and permanent" disability provision.[10]  Plaintiff was 47 years old at the time of his application for these benefits, and was not receiving Social Security benefits at the time;[11] thus, to be eligible for

---

[10]Jones applied for disability benefits under the "Football Degenerative" provision of the Plan.  Such disability is defined as "aris[ing] out of League football activities, and results in total and permanent disability before fifteen years after the end of the Player's last Credited Season." Plan, § 5.1(c).  Jones played League football until 1993, i.e., his last Credited Season, so his disability had to be present before the end of the year 2008.  As an alternative, Jones sought disability benefits under the Plan's provision for "Inactive" disability, i.e., if the total and permanent disability arises from other than League football activities or the disability is evidence more than fifteen years after the end of the Player's last Credited Season. Plan, § 5.1(d).

[11]"Effective April 1, 2007, a Player who has been determined by the Social Security Administration to be eligible for disability benefits ... and who is still receiving such benefits at the time he applies, will be deemed to be totally and permanently disabled ...." Plan, § 5.2(b).  Thus, if Jones had been receiving Social Security benefits when he submitted his application for the Plan's disability benefits in July 2008, he would have been deemed to be disabled, pursuant to the

benefits he had to show that he was "totally and permanently disabled" to the extent that he was "substantially prevented from or substantially unable to engage in" any occupation or employment.  Plan, § 5.2(a).  Jones disclosed that he was employed by a parks and recreation department at the time of his application for disability benefits, but in the cover letter accompanying his application his attorney explained that such employment was "out of benevolence."  His application noted that he was being treated by a Dr. Speiler for ongoing lower back and neck pain, and "intermittent leg and knee pain with extended sitting or minor walking/standing."

<u>Denial of Jones's application for disability benefits</u>

Jones's application for disability benefits was denied in August 2008 by the Disability Initial Claims Committee of the Plan.  JRJ 000066-68.  The Committee noted that "actual employment is incompatible with a finding of total and permanent disability."  <u>Id.</u>  It does not appear that the Committee had recent medical records to review at that time, as Jones had not supplied those records when he submitted his application.  (His attorney's letter accompanying the application had requested additional time to submit the records.  When Jones's application was denied by the Committee, his attorney requested reconsideration - arguing that the Committee erred by not responding to the request for additional time to submit the records.  JRJ 000074-77.)    Nor did the Committee have documentation to establish that the recent employment, disclosed by Jones in his application for disability benefits, had been

---

Plan, §§ 5.2(b), 5.8(b)(1).

offered to Jones out of benevolence.[12]

Jones submitted an appeal of the decision in December 2008 and provided medical records as well as documentation that the employment (which now had ended) had been "out of benevolence." It appears from the record that some of the additional evidence submitted for consideration during the appeal had been created during a workers' compensation dispute between Jones and the Seattle Seahawks. See, e.g., JRJ 000137-140. Before the Board met again, Jones supplemented his application with additional medical information, including other documents apparently related to the workers' compensation dispute. See, e.g., JRJ 000145-206, JRJ 000207-208. The Court addresses the medical evidence in some detail, below.

The Board met in February 2009 and after reviewing this additional information, the Board postponed a ruling on the appeal to allow Jones to be examined by a neutral physician selected by the Plan. After Jones was seen by Dr. Glenn Perry, the neutral physician, the Board met in May 2009. The Board considered Dr. Perry's report and then referred Jones for a functional capacity evaluation that would provide "a complete assessment of impairments and ability to work." Pursuant to the Plan's direction, Jones was seen by Dr. Alex Moroz and Dr. Jangwhon Yoon. After another review of the medical records, the Board voted in August 2009 to decide whether Jones met the Plan's definition of total and permanent disability, but the vote resulted in a deadlock. According to the Plan's provisions, when the Board reached a deadlock, the Board could

---

[12]A subsequent letter from the employer, dated October 1, 2008, described the work as temporary, only for the summer, and that it had been offered to Jones out of benevolence by a former coach who had known Jones for twenty-eight years. JRJ 000089-90.

submit the dispute to a Medical Advisory Physician ("MAP"), selected by the Plan, for a final and binding determination.[13]

The MAP, Dr. Harlan Selesnick, issued a report dated September 24, 2009, finding that Jones was not "totally and permanently disabled." The Board met on November 18-19, 2009 and adopted that determination by Dr. Selesnick in a decision issued by the Board on November 24, 2009. Jones objected to that decision and filed this lawsuit on December 1, 2010; subsequently, the parties agreed to allow the Board additional time to consider evidence Jones provided to rebut Dr. Selesnick's finding (including a peer review conducted by Dr. Lawrence Eppelbaum, which had been submitted by Jones on November 12, 2009, prior to the Board's meeting). The Board also was able to review the finding by the Social Security Administration, issued on December 23, 2010, that Jones was permanently disabled according to the Social Security Administration's definition of disability, as of September 1, 2008.[14]

The Board met in February 2011, reviewed the supplemental information, and issued a decision on February 23, 2011, re-affirming its earlier determination and noting that the Social Security decision made it clear that Jones was not receiving

---

[13]If the voting members of the Board are deadlocked with respect to a decision (as to whether a Player is substantially prevented from or unable to engage in any occupation or employment), the Board may by an affirmative vote of three voting members submit such disputes to a Medical Advisory Physician for a final and binding determination regarding such medical issues. Plan, § 8.3(a).

[14]Although the Defendant states that the decision by the Social Security Administration found that Jones was "qualified as of that date [December 23, 2010] to receive Social Security disability benefits," ECF No. 39, ¶ 23 - a statement with which Plaintiff agrees, ECF No. 47, ¶23 - the Court reads the decision as finding that Jones has been disabled since September 1, 2008. JRJ 000352, JRJ 000359.

Social Security benefits during the 2008 Window Period and did not otherwise qualify for disability benefits under the Plan's definition of disability.

ANALYSIS

The Court must uphold the Board's decision if there is substantial evidence to support that decision, i.e., if there was a reasonable basis for the decision to deny disability benefits to Jones, even if there is some evidence supporting a contrary result.

Medical evidence before the Board prior to its decision to deny benefits

The Court has reviewed the medical evidence contained in the Administrative Record - all of which, of course, was available to Defendant for review when making its determination that Jones was not totally and permanently disabled – some of which has been referenced, above.  The evidence is summarized, below.

Dr. Craig Lichtblau – Treating Physician, and Marc Yeager, Physical Therapist

On August 27, 2008, after Jones received the Plan's initial denial of his application for disability, Dr. Craig Lichtblau, Board certified in Physical Medicine and Rehabilitation, began treating Jones.  JRJ 000069-73.[15]  As a result of this initial evaluation, Dr. Lichtblau stated that in terms of "work status" that Jones "may continue his activities at a level comfortable for him."  JRJ 000073.  Dr. Lichtblau ordered MRIs of Jones's cervical and lumbar spines, and both knees, and reviewed those

---

[15]It is unclear why no records were submitted from the physician, Dr. Speiler, reportedly treating Jones prior to his application for disability.

MRIs.

Jones was given a Functional Capacity Evaluation (FCE) on December 11-12, 2008, administered by Marc Yeager. Mr. Yeager concluded that Jones did not meet the "Sedentary Work" physical demand job classification because Jones was unable to tolerate sitting for more than 50% of the workday. JRJ 000109-10. Yeager's tests concluded that Jones can only sit or stand between 6-33% of the workday. JRJ 000113.

Approximately one month later, on January 27, 2009, Dr. Lichtblau conducted a Medical Functional Capacity Assessment, JRJ 000216-245, "to accurately determine [Jones's] functional restrictions so that he may return to gainful employment within safe parameters," JRJ 000219. Dr. Lichtblau concluded that Jones "does not have the functional capacity to work 4 hours per day at this time [and] is going to suffer from acute, intermittent exacerbations of pain and discomfort, and when he experiences acute, intermittent exacerbations of pain and discomfort, he will have good days, bad days, and missed days of work." JRJ 000224-225. He concluded that Jones "will not be able to maintain gainful employment in the competitive open labor market or in a sheltered environment with a benevolent employer secondary to acute, intermittent exacerbations of chronic pain, ... [and] his disability will actually increase over time." JRJ 000225, 000230.


Tommy Nobis Center - certified rehabilitation counselor

From December 8-10, 2008, Jones was examined at an employment rehabilitation

center.  Although Jones was able to sit or stand when necessary, the reviewer noted that Jones had an inability to stay focused, and he needed frequent breaks which made him unable to achieve a competitive production rate.  JRJ 000103-104, JRJ 000128-130.

Dr. Michael Luciano - Orthopedic Surgery

On January 13, 2009, Jones was seen by Dr. Michael Luciano, a Diplomate of the American Board of Orthopedic Surgery, for an "Agreed Medical-Legal Evaluation.  Dr. Luciano reviewed Jones's medical records from 1983-2008, and conducted an examination, concluding that vocational rehabilitation was indicated and that Jones was able to perform work duties compatible with certain restrictions detailed in the report.  JRJ 000145-200.  Dr. Luciano found Jones to be 50% impaired.  JRJ 000199.

Dr. Jay Prakash - Internal Medicine

Dr. Jay Prakash, a Diplomate of the American Board of Internal Medicine and the American Board of Preventive Medicine, examined Jones on January 14, 2009, and reviewed his medical records, apparently as an independent medical exam in the context of a workers' compensation proceeding.[16]   Dr. Prakash concluded that Jones had a "40% impairment of the Whole Person" due to his hypertensive heart disease, and he restricted Jones from heavy lifting and stress.  JRJ 000262-265.  Dr. Prakash found that Jones had a permanent disability which was not likely to improve with medical or

---

[16]It also appears that Dr. Luciano's evaluation, as well as an exam by Dr. Kenneth Nudleman, JRJ000137-140, were conducted in relation to the same workers' compensation matter in California.

surgical treatment.  JRJ 000253.

When the Board met on February 12, 2009, it apparently only had the materials submitted prior to or accompanying the December 23, 2008, letter from Jones's attorney, which only included Dr. Lichtblau's initial report and the report of Mr. Yeager, a report of a Dr. Nudleman (apparently related to a workers' compensation dispute), and the report of the Nobis Center, but did not include the report of Dr. Lichtblau's January 2009 examination of Jones, nor the other physicians' records created in January 2009. The Board was unable to make a determination as to whether Jones was disabled based on the medical records available at that time, and referred Jones to Dr. Glenn Perry for an independent medical evaluation.  JRJ 000252.

Dr. Glenn Perry - Orthopaedist identified by Plan

On March 26, 2009, Dr. Perry examined Jones and found that he was impaired as to his cervical and lumbar spine, and both knees, but concluded that Jones could perform light to medium duty work. JRJ 000272-000273, JRJ 000275-276. According to Plaintiff, Dr. Perry's examination lasted no more than thirty minutes. JRJ 000279.

Dr. Lawrence Eppelbaum

Dr. Eppelbaum, a Certified Disability Examiner in the State of Georgia,

examined Jones - apparently either on Jones's request or in relation to the workers' compensation dispute - on March 27, 2009, and found him to be "totally disabled to the extent that he is substantially unable to engage in any occupation for remuneration or profit." JRJ 000269. Dr. Eppelbaum concluded the total disability was a result of chronic neck, lower back, and bilateral knee pain from NFL injuries. Id.  Dr. Eppelbaum's report is styled "Independent Medical Examination" but he was not identified by the Plan as a medical reviewer.

Again the Board met, in May 2009, and was unable to reach a decision as to Jones's application for disability benefits, instead referring Jones for a Functional Capacity Evaluation and examination by staff at New York University (NYU) Hospital for Joint Diseases and the NYU School of Medicine.  JRJ 000288.

Dr. Alex Moroz – Musculoskeletal Disability Evaluation, and Dr. Janghwon Yoon, Physical Therapist - both identified by Plan

On July 7, 2009, Jones was evaluated for musculoskeletal disability by Dr. Alex Moroz, an Assistant Professor of Rehabilitation Medicine at NYU School of Medicine. Dr. Moroz concluded that Jones was capable of performing light level of work occasionally (up to 1/3 of the day), and unable to sustain work for 8 hours a day.  JRJ 000294, JRJ 000322. On that same date, Jangwhon Yoon, Ph.D., performed a Physical Work Performance Evaluation on Jones. JRJ 000295-305. Dr. Yoon, on staff at the

16

Occupational and Industrial Orthopaedic Center, found that Jones was capable of sustaining a light level of work for an 8 hour day, and observed that the overall level of work was significantly influenced by Jones's self-limiting behavior due to pain. Dr. Yoon concluded that Jones can sit or stand up to 1/3 of a workday.   JRJ 000300. Plaintiff complains that Dr. Perry and Dr. Yoon failed to test for all aspects of "light duty" work, including lifting/carrying, reaching, etc.

The Board met again in August 2009 and the six members (three members appointed by the PA and three appointed by the MC) were unable to reach a determination as to whether Jones was disabled.  In light of the Board's deadlock, the Board was bound to follow the opinion of a neutral examining physician, or MAP, pursuant to the terms of the Plan.

Dr. Harlan Selesnick – Medical Advisory Physician

On September 24, 2009, Jones was examined by Dr. Harlan Selesnick, selected as the Board's MAP, i.e., selected jointly by the PA and MC.  JRJ 000320-321; JRJ 000326-328. Dr. Selesnick, a Board certified physician and the Team Physician for a professional basketball team (the Miami Heat), reviewed the reports of Dr. Lichtblau, Dr. Perry, Dr. Moroz, and Dr. Yoon, and found that Jones had decreased range of motion in his lumbar and cervical spine.  JRJ 000327.  In a report submitted to the Board on October 9, 2009, Dr. Selesnick concluded that Jones could be employed for light duty in a sedentary position.  JRJ 000321, JRJ 000328.  Plaintiff argues that Dr.

Selesnick conflated and confused the standards for light duty work.  The Court observes, however, that the Plan specifically does not define, nor adopt, specific criteria for various levels of employment.  Plaintiff also complains that the Plan did not send all of his records to Dr. Selesnick for review - for example, Dr. Selesnick does not indicate that he reviewed the records of the Nobis Center, JRJ 000128-130, Dr. Luciano, Dr. Prakash, and Dr. Eppelbaum, or the FCE performed by Mr. Yeager, JRJ 000105-127.  Defendant responds that even if Dr. Selesnick had reviewed the other records it would not have changed the conclusion Dr. Selesnick reached because the Nobis Center report lacked a detailed analysis and the FCE performed by Mr. Yeager relied on the same Dictionary of Occupational Titles ("DOT") which was addressed in other reports submitted by Jones and reviewed Dr. Selesnick.  For example, both Dr. Moroz and Dr. Yoon reference the DOT.

The evidence before the Court indicates that the Plan does not incorporate the DOT standards in determining disability.  The only operative definition of disability in the Plan is that found in § 5.2: "substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit."  According to Sarah E. Gaunt, Plan Director, who is responsible for supervising the processing of applications for benefits under the Plan, the Board does not "rely on any other standard or measure to ... make eligibility determinations."  ECF No. 40-1, Declaration of Sarah E. Gaunt, dated June 21, 2011.

On October 1, 2009, Dr. Moroz had issued a brief addendum to his July 2009 report, in response to a question posed by Plan staff, as to whether Jones was "totally

disabled to the extent that he is substantially prevented or substantially unable to engage is [sic] any occupation or employment for remuneration or profit?"  Dr. Munoz responded: No. JRJ 000322. After receipt of Dr. Moroz's response, and after reviewing Dr. Selesnick's opinion, the Board adopted Dr. Selesnick's opinion and issued its decision on November 24, 2009, denying disability benefits to Jones.[17]

The Board's evaluation of the evidence submitted after the Board's denial of benefits

Jones subsequently was found disabled by the Social Security Administration ("SSA"), which issued a determination on December 23, 2010 (approximately one and one-half years after Jones applied for disability), authored by Administrative Law Judge Victor Cruz, that Jones was unable to perform any job, therefore finding Jones disabled.  The SSA defines "Disability" as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months."  JRJ 000349-359. The Judge gave great weight to the opinions of Dr. Lichtblau, Dr. Luciano,

---

[17]Jones had requested that Dr. Eppelbaum conduct a peer review of the findings of the Plan-referred medical evaluators: Dr. Selesnick, Dr. Perry, Dr. Yoon, and Dr. Moroz.  On November 11, 2009, Dr. Eppelbaum restated his conclusion that Jones is totally disabled. JRJ 000333.  Dr. Eppelbaum asserted that Dr. Selesnick's conclusions were inaccurate due to a failure to test Jones' sitting, standing, lifting, and carrying tolerances; Dr. Eppelbaum claimed that without testing of tolerances, a functional capacity of a patient cannot be accurately established. JRJ 000335.  He also asserted that none of the examiners seemed to understand the criteria for - and none explained Jones's ability to perform any type of - sedentary, light, or medium work as defined in the DOT, but the Court notes that the Plan does not specifically adopt the DOT criteria nor is the Board controlled by such criteria.

and Dr. Prakash, and concluded that Jones had the residual functional capacity to perform a very limited range of sedentary work. JRJ 000356.[18] The Judge asked a vocational expert whether jobs existed in the national economy for someone with Jones's age, education, work experience, and residual functional capacity, and the expert testified that there were no jobs for Jones. JRJ 000358. The SSA determined that Jones had been disabled from September 1, 2008, the last date on which he had been employed.

The Board was able to review the SSA information during the parties' agreed remand of this matter, and at a meeting in February 23, 2011, the Board re-opened the matter to address the materials provided in support of Jones's request. (The Defendant also may have taken into consideration the peer review of Dr. Eppelbaum, and other medical records supplied by Jones.)  The Board reviewed the additional records submitted by Jones, noting that Jones could have submitted such records during the normal course of the administrative proceedings but failed to do so, JRJ 000364. The Board concluded that the late-submitted records did not override the  decision of the MAP, a conclusion with which this Court does not disagree. The terms of the Plan are clear that the opinion of the MAP is binding on the Board. The Board also specifically did not find the SSA determination to be controlling and in a letter issued March 7, 2011, announced its decision to uphold its earlier determination that Jones was not

---

[18]The Judge concluded that Jones had several "severe impairments: right knee medial and lateral meniscus tear; cervical and lumbar myofascial pain syndrome; degenerative disc disease of cervical and lumbar spine with disc bulging and disc desiccation at multiple levels; and hypertension." JRJ 000355.

entitled to disability benefits.  JRJ 000362-365.  The Board concluded that Jones was

not eligible for disability benefits under the Plan's general rules because he had been

receiving early retirement benefits, and that Jones did not meet the exceptions to that

general rule contained in § 5.8(b)(1) or (b)(2) of the Plan.


<u>The Board's decision to deny benefits was neither wrong,<br>nor the result of an abuse of the Board's discretion</u>

Jones admits that the record contains some evidence to support Defendant's

decision.  "The only evidence supporting a denial of benefits is *the opinion of Dr. Perry,*

*the opinion of Dr. Selesnick*, and one-liner of "No" from Dr. Moroz."  ECF No. 37-1, p.

23 (emphasis added).  Discounting the referenced  statement by Dr. Moroz, it is clear

that Plaintiff acknowledges that both Dr. Perry and Dr. Selesnick's opinion support the

decision of the Defendant to deny disability benefits to Jones.  Both doctors examined

Jones, and reviewed medical records or study results before announcing their conclusion

that Jones was able to perform light duty.  The Court notes that Dr. Selesnick did not

simply adopt the exact conclusion of Dr. Perry, which had included "light duty to

medium duty" work, but instead limited his conclusion to "light duty" after reviewing

the medical records and examining Jones personally.

The Court observes that Mr. Yeager and the Nobis Center found that Jones was

able to sit or stand for a portion of a workday (Yeager, FCE) or when necessary (Nobis),

and both Dr. Luciano and Dr. Prakash found that Jones was only 50% impaired at most

(Dr. Prakash assessed the impairment at 40%).  Dr. Lichtblau opined that Jones was

unable to work half-days (four hours), because of acute, intermittent exacerbations of

pain, but noted that Jones would have some good days.  Dr. Moroz found Jones able to perform a light level of work for up to 1/3 of the day, as did Dr. Yoon, but Dr. Moroz did not equate that finding with a total disability according to the Plan's definition.  Dr. Perry opined that Jones was able to perform at least a light level of work.  And, importantly, Dr. Selesnick, the MAP, concluded that Jones was not disabled according to the Plan's definition, and his opinion was final and binding on the Board. JRJ 000364.

Plaintiff complains that the Board never hired a vocational expert to evaluate whether there were jobs available to Jones based on his disabling conditions.  However, the Board had evidence of three FCEs (Dr. Lichtblau's Medical Functional Capacity Assessment, Mr. Yeager's FCE, and Dr. Yoon's Physical Work Performance Evaluation). The Court does not find the Board's failure to hire a vocational expert to be an abuse of discretion in light of the evidence that was before the Board prior to making its final determination.

Plaintiff complains that Defendant "cherry-picked" evidence that did not support the claim, but Plaintiff has not established that such evidence was "snippets" of records taken out of context. Helms v. Gen. Dynamics Corp., 222 Fed. Appx. 821, 833 (11th Cir. 2007) (it was unreasonable for an ERISA plan administrator to rely on a "scintilla of evidence pulled out of context" in the face of extensive documentation supporting a claim for short-term disability benefits).  The Court does not find that the Plan completely de-emphasized the great weight of the evidence.  Instead, the Court notes that, because the Plan definition requires that a claimant be "substantially prevented

from or substantially unable to engage in any occupation or employment for remuneration or profit" and there is sufficient evidence in the Administrative Record that independent physicians deemed Jones capable of at least light duty, that the Board's decision is supported.[19]  Thus, the Court cannot find that the decision was wrong, nor that the Plan abused its discretion.

The Plan was free to deny benefits in the face of conflicting medical opinions, as long as the evidence on which it relied to support its decision was substantial.  As summarized above, the Plan had substantial evidence that Jones could sit or stand for up to 1/3 of a work day, and that Jones was able to perform light duty work in a sedentary position - albeit with significant back pain, some knee pain, and stiffness. Based on this record, the Court finds that the Plan did not err in finding that Jones was not "substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit." Jones had multiple football-related injuries, and had developed hypertensive heart disease as he aged, which limited his ability to deal with the stress of full time employment - such condition is not equivalent to a clear determination that Jones was totally disabled. Although the Court is sympathetic to Jones's condition, the Court does not find that the Board's decision lacked a rational basis.  The Board decided that Jones was not substantially unable to engage in employment, or - stated otherwise, the Board implicitly found that Jones was able to

---

[19]Dr. Eppelbaum is the only physician to conclusively state that Jones was totally disabled.

work in some occupation.[20]

Although the Social Security definition is similar to the definition adopted in the Plan, and the SSA determined that Jones was "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment," the Plan is not bound to rely on a SSA determination other than when the provisions of § 5.8(b)(1) of the Plan are met.  Indeed, the Plan's definition of disability is so broad as to require, in essence, that an applicant be unable to work in any capacity in order to meet the definition of "totally and permanently disabled."  Several of the reviewing physicians declined to find Jones totally disabled.  The Plan need only demonstrate that it relied on substantial evidence for its decision; substantial evidence has been described in other contexts as "more than a scintilla, but less than a preponderance."  Bloodsworth v. Heckler, 703 F.2d 1233. 1239 (11th Cir. 1983).  See, also, Pierce v. Underwood, 487 U.S. 552 (1988) (citations omitted) ("That phrase [, "substantial evidence"], does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'")[21]

Finally, the Court finds that the Plan appears to have engaged in a deliberate, principled reasoning process.  On two occasions, in February and May 2009, the Board

---

[20]It may be that the Board considered the ability to engage in part-time employment to be sufficient to defeat a claim of "total" disability.  That is not a question for the Court to answer.

[21]While the Court may have preferred to have evidence from Dr. Selesnick which included Dr. Selesnick's review of the SSA decision, that failure is insufficient to render suspect an otherwise supportable decision by the Board.

deferred making a determination on Jones's claim, instead directing further evaluations

be performed by physicians selected by the Plan (the product of an agreement between

the PA and the MC). Then, in November 2009, when the Board deadlocked over the

decision to award benefits, the Board unanimously voted to allow an MAP to make a

binding decision. Although Jones complains that he was denied a timely ruling on his

application, the Court finds that the submission of the issue to independent examiners

is not indicative of bad faith by the Plan. When faced with mixed medical opinions, this

Court is not inclined to find an abuse of discretion.


## CONCLUSION

The Court has reviewed the administrative record and finds that the Board

correctly determined that Plaintiff failed to qualify as a Social Security recipient at the

time of his application during the Window Period and thus was not eligible for benefits

under § 5.8(b)(1) of the Plan, and that Plaintiff failed to establish that he was totally

and permanently disabled and entitled to benefits pursuant to § 5.1 or § 5.2(a) of the

Plan. Three independent medical evaluators (Dr. Perry, Dr. Moroz, and Dr. Selesnick,

all selected by the Plan, which is controlled jointly by the PA and MC) concluded that

Jones could engage in light duty or sedentary work, and the Court cannot find that the

decision of the Board was wrong as to this conclusion. Jones did not meet the terms of

the special Window Period regarding a Social Security determination, and had not

established entitlement to disability benefits under the Plan's exception to the general

rule that a Player receiving early retirement benefits waives his right to receive

disability benefits (a waiver which Jones acknowledged when he received his earlier benefits). Even if the Court were to find that the Plan's decision was wrong, the Court finds that there were reasonable grounds for the Defendant's decision to deny Jones's application for benefits, even though there is some evidence contrary to that decision; moreover, the Court does not find that Defendant operated under a conflict of interest. In light of the above, even if the Court were to find that the decision to deny disability benefits to Jones was wrong, the Court would not be able to find that such decision was arbitrary and capricious. Based on the above, it is

ORDERED AND ADJUDGED that the Plaintiff's Motion for Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED. Final judgment will be issued by separate order on this date.

DONE AND ORDERED in Chambers in Miami this/ 3 day of May 2013.

WILLIAM M. HOEVELER
SENIOR UNITED STATES DISTRICT COURT JUDGE

copies to: counsel of record